UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

KEVIN REYOME,

                                        Plaintiff                    DECISION AND ORDER

-vs-
                                                                     16-CV-6446 CJS

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____


APPEARANCES

For the Plaintiff:          Mark M. McDonald
                            Bond and McDonald
                            91 Genesee Street
                            Geneva, New York 14456


For the Defendant:          Andreea L. Lechleitner
                            Social Security Administration
                            Office of General Counsel
                            26 Federal Plaza, Room 3904
                            New York, New York 10278

                            Kathryn L. Smith, A.U.S.A.
                            Office of the United States Attorney
                            for the Western District of New York
                            100 State Street
                            Rochester, New York 14614


INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Kevin Reyome ("Plaintiff") for Supplemental Security Income

Benefits ("SSI").  Now before the Court is Plaintiff's motion for judgment on the

pleadings (Docket No. [#9]) and Defendant's cross-motion [#10]) for judgment on the

1

pleadings.  Plaintiff's motion is granted, Defendant's cross-motion is denied and this matter is remanded for further administrative proceedings.

## FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.  Briefly, Plaintiff claims to have a number or disabling impairments including right knee replacement, diabetes, degenerative disc disease of the lumbar spine, coronary artery disease, depression and borderline intellectual functioning.  Plaintiff is claiming disability beginning September 5, 2011. (T. 19).  Plaintiff filed a previous disability claim in 2007, which was denied. (T. 44).

Plaintiff dropped out of school after the 8th grade.  Plaintiff claims that as an adult he attempted to obtain a high school equivalency diploma, but failed the test three times.  Plaintiff states that the person assisting him to take the equivalency exam told him that he reads and writes at the level of a third grader.  Plaintiff has a driver's license, but claims that he needed an employee of the Department of Motor Vehicles to read the driver's test to him. (T. 22).

Plaintiff has worked at various jobs, including assembly line worker in a cardboard box factory; machinist; painter; newspaper deliveryman; and activity aide at a senior citizen's center. (T. 118, 126).  Plaintiff and his girlfriend also co-owned and operated a lawn care company for three years. (T. 19-20).  Plaintiff last worked for an employer between 2006 and 2008, part-time, as a condition of receiving public assistance. (T. 19).  Plaintiff's earning record shows no reported income for the years 2001, 2004, 2005 and 2009-2013. (T. 104).

Plaintiff admits that he has not "made any attempt to find work" since 2012. (T.

2

37).  Plaintiff indicates that there is no point in looking for work, because he "knows his limits."  At the hearing before the Administrative Law Judge ("ALJ"), Plaintiff emphasized that he believes he should be found disabled because any job that he might obtain would have a thirty-day trial period, which he would inevitably be unable to complete, due to various reasons:

Q. Do you think you could work at a – at the normal work pace of your past jobs?

A. No.

Q. All right.

A. Because the way the work community is nowadays, you're on a 30-day probation and if you're not right there and on that second of every work minute, you're – they're going to – you know, then you're back to where you are now and then you're back to filling out applications. . . .

*** 

Q.  [B]ut do you feel that you could work a full-time job?

A. No, because I wouldn't last the 30 days.

Q. And what do you mean by that?  What would happen?

A. Well, I would go out of breath, probably mess up my knee.  I would read something wrong and it wasn't right and I stuck my hand into something there, shouldn't have been there.

*** 

One of the reasons why I had a difficult time trying to get a job [was] because of my weight [lifting] limit and my education and for – like say if I went to go work on a farm or something and I go try to pick up a bale of hay or a bucket of feed or something like that, you know, I – that's why I'm kind of – the – *I hate to keep saying saying it, but you got that 30-day, Your Honor, you know what I'm saying, on any job you go to and I'm not saying I don't want to work and I'm not saying I can't work.*  I'm just saying I know my limitations to end up being back here again or back where I'm

3

at now.  You know what I'm saying?  I don't – that's my reason, you know. It ain't like I don't want to work.  I just –

Q. Okay.

A. I know my limits, man.

(T. 25, 29, 37) (emphasis added).

Plaintiff has also expressed the view that he is unemployable, at least in part, because he never obtained his high-school equivalency diploma. (T. 26, 64, 172). Plaintiff has submitted an affidavit from Paula Alesso ("Alesso"), whom he identifies as his former girlfriend and current landlord, who contends that Plaintiff cannot read or write. (T. 172) ("In today's requirements to be able to get a job he needs to be able to read [and] write and have a GED.  Kevin does not have any of these qualifications.").

Plaintiff has resided for more than a decade with Ms. Alesso.  Plaintiff indicates that he presently rents a bedroom within Alesso's five-bedroom house, and that they share the kitchen.  Plaintiff performs all of his own "regular chores," such as cleaning, cooking and shopping. (T. 26, 28, 36).  There are references in the record to Plaintiff performing tasks, such as changing a tire, placing a snow plow on a truck, and "moving stuff" "using a 2-wheel cart" during the relevant period of alleged disability. (T. 389).

In support of his claim Plaintiff submitted medical evidence, including an opinion from his primary treating physician, internist Arif Choudhury, M.D. ("Choudhury"). Choudhury's report, dated February 14, 2014, indicated that Plaintiff has chronic low back pain, but generally retains the exertional ability to perform light work, except that he should never stoop or crouch. (T. 382-384).  However, Choudhury also indicated

that Plaintiff would have "good days" and "bad days," and on average would miss "more than four days per month" from work. (T. 383).

Interestingly, Choudhury's report indicated that with regard to the condition of chronic low-back pain about which he was expressing an opinion, he "first saw the patient" and "last saw the patient" both on the same date, November 18, 2013. (382). According to Choudhury's office notes, on November 18, 2013, Plaintiff complained of "acute and chronic low back pain on the right side for a few days without any reason." (T. 378).[1] Plaintiff reportedly told Choudhury that he had experienced low back pain "for a long time but [had not seen] any orthopedic [doctor] because of having no insurance in the past." (T. 378).[2] Choudhury stated that a spine x-ray showed only "mild" degenerative joint disease. (T. 379). Choudhury recommended Tylenol for pain, and urged Plaintiff to see an orthopedic specialist. (T. 379, 384). Choudhury next saw Plaintiff on February 13, 2014 (the day before he wrote his report), but did not comment on Plaintiff's back injury, except to note that Plaintiff was being seen for that condition by an orthopedic specialist, Daniel Alexander, M.D. ("Alexander"). (T. 388). Choudhury noted, however, that Plaintiff appeared to be in no acute distress and had a normal gait. (T. 387).

Upon Choudhury's referral, Plaintiff sought treatment for his back pain from orthopedic specialist Dr. Alexander. On December 30, 2013, Alexander wrote in an

---

[1]Office notes by Choudhury dated August 7, 2013 and November 6, 2013, respectively, do not list low-back pain as a condition about which Plaintiff was complaining or for which he was being treated. (T. 354, 369-370).

[2]Somewhere in the record Plaintiff indicates that he originally injured his back after he fell on some steps while delivering newspapers. Plaintiff delivered newspapers between 1994 and 1999, and between 2000 and 2003. (T. 118).

office note that Plaintiff was complaining of "constant" and "unbearable" pain in his lumbar spine. (T. 390). Alexander summarized the results of MRI testing performed on December 19, 2013, as showing

> a diffuse L3-L4 disc bulge, left far lateral disc protrusion, with encroachment on the left L3 nerve root resulting in moderate left neural foraminal narrowing and diffuse L4-L5 disc bulge and right far lateral disc protrusion with encroachment on the right L4 nerve root without moderate right neural foraminal narrowing L5-S1, moderate to severe bilateral neural foraminal narrowing, moderate multilevel disc disease and facet degeneration, mild to moderate spinal canal stenosis from L1-L2-4.

(T. 390). Alexander's impression was "lumbar spine degenerative disc disease with diffuse L3-4 disc bulge and diffuse L4-L5 disc bulge." (T. T. 390). Alexander prescribed Flexeril for pain, and offered to arrange for Plaintiff to have epidural injections (subject to the approval of Plaintiff's cardiologist). However, as discussed further below, it does not appear that Plaintiff ever took such medication or went ahead with such treatment. (T. 390).

Subsequent to the acute flare-up of Plaintiff's back pain in November and December 2013, his pain improved. On March 18, 2014, Plaintiff indicated that he was having back pain only "every other day," for which he was taking only over-the-counter Tylenol Arthritis. (T. 22-23). Plaintiff indicated that he was intentionally declining to take any stronger pain medication, "because [he was] diabetic," and because he did not "want to get hooked on muscle relaxers." In any event, Plaintiff stated that, "the Tylenol Arthritis is working." (T. 23). Plaintiff stated that his back pain would "flare up" if he over-exerted himself while doing his "regular chores," and that such a flare up would last "about four hours until the Tylenol kicks in." (T. 26). Plaintiff estimated that he

would have "severe" pain "about a week or two out of a month." (T. 26).

On February 28, 2012, more than a year before Plaintiff experienced the aforementioned flare-up of his back symptoms, he underwent a consultative examination by Harbinder Toor, M.D. ("Toor"), at the Commissioner's request.   Plaintiff reportedly told Toor of "a history of injury many years ago in the right side of the lower back and right hip." (T. 261).   Toor observed that Plaintiff appeared to be in no acute distress, had a normal gait, had difficulty walking heel-to-toe, could squat about 50% of normal, needed no help getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 262).   Toor reported that Plaintiff had some limited movement of the lumbar spine, but negative straight-leg raising bilaterally. (T. 263).   Overall, Toor's opinion was as follows:

> He has moderate limitation standing, walking, squatting, bending and lifting.  He has mild limitation grasping, holding, writing, tying shoes, zipping a zipper, buttoning a button, manipulating a coin, or reaching.  He has moderate limitation doing exertion because of cardiac condition.

(T. 264).

Plaintiff also obtained a "psychoeducational evaluation" from Christa Dinolfo, Psy.D. ("Dinolfo").  The purpose of the evaluation was to assess Plaintiff's "intellectual abilities and reading skills." (T. 326).  Plaintiff reportedly told Dinolfo that he quit school at age sixteen, and that he had often been involved in fights at school. (T. 326).  Dinolfo administered intelligence testing, and concluded that Plaintiff was in the borderline range, with a full-scale IQ score of 74. (T. 327).  However, Dinolfo noted that Plaintiff scored higher in certain areas, such as perceptual reasoning and processing speed (84 and 94, respectively), and lower in other areas, such as comprehension and working

memory (70 and 63, respectively). (T. 327). Dinolfo assessed Plaintiff's reading abilities as being at about the first-grade level, and, alternatively, as "quite limited." (T. 328).

After Plaintiff's claim was denied initially he requested a hearing before an Administrative Law Judge ("ALJ"). In preparation for that hearing, on February 12, 2014, Plaintiff's attorney filed a pre-hearing brief in which he identified Plaintiff as having the following impairments: Status post myocardial infarction/acute coronary syndrome; status post right knee total arthroplasty; diabetes mellitus II; obesity; hyperlipidemia; low back pain; degenerative arthritis of the left hand; and borderline intelligence. (T. 162-168) For reasons that will be discussed below, it is notable that Plaintiff's pre-hearing brief did not mention a shoulder injury.

On March 18, 2014, a hearing was conducted before an ALJ. At the hearing, Plaintiff testified concerning the conditions listed in his pre-hearing brief, and the ALJ received into evidence Exhibits 1F-19F, consisting of medical records and medical opinion evidence. Additionally, Plaintiff testified about a shoulder injury, which had not been mentioned previously and which did not appear in Exhibits 1F-19F. Plaintiff testified that he had recently injured his shoulder in a fall, and that such injury restricted his ability to lift. (T. 27) ("Q. And how about lifting? Any limitations for you? A. Well, my heart doctor when I first [INAUDIBLE] was 50 pounds. That was -- and since I've done my -- fall on my back and my shoulder, I'm lucky I can pick ten pounds[.]"). However, Plaintiff's testimony concerning this shoulder injury was brief and vague.

On June 9, 2014, the ALJ issued his decision denying Plaintiff's application. The ALJ found that Plaintiff was not under a disability at any time between the date of his application, November 29, 2011, and the date of his decision. (T. 44). At steps one-

through-three of the familiar five-step sequential evaluation used to evaluate disabilitiy

claims, the ALJ found, respectively, that Plaintiff has not engaged in substantial gainful

activity since November 29, 2011; that Plaintiff has the following severe impairments:

"status post right total knee arthroplasty, degenerative disc disease of the lumbar spine,

diabetes mellitus, coronary artery disease, depression, and borderline intellectual

functioning;" and that none of those impairments meet or equal a listed impairment. (T.

46). The ALJ did not mention the shoulder injury at any point in his decision.

Prior to reaching step four of the sequential analysis, the ALJ found that Plaintiff

has the residual functional capacity ("RFC") to perform "light work as defined in 20 CFR

416.967(b)," provided that it involves "simple tasks;" only occasional climbing,

balancing, stooping, kneeling, crouching or crawling; and no management or

supervision of others. (T. 50). In terms of exertional requirements,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job is in this category when it requires a
> good deal of walking or standing, or when it involves sitting most of the
> time with some pushing and pulling of arm or leg controls. To be
> considered capable of performing a full or wide range of light work, you
> must have the ability to do substantially all of these activities. If someone
> can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

When making that RFC determination, the ALJ accepted many of Choudhury's

opinions while rejecting others, such as Choudhury's statement that Plaintiff would miss

more than four days of work per month. The ALJ stated that such opinion was not

explained or supported by Choudhury's treatment notes. (T. 53). The ALJ also rejected Dr. Toor's assertion that Plaintiff had mild limitations using his hands, finding that such opinion was not supported by the overall medical evidence or by Plaintiff's activities. (T. 53).

The ALJ did not expressly state what weight he gave to Dinolfo's report as part of his RFC discussion. However, it is evident from the ALJ's discussions at steps two, four and five that he accepted Dinolfo's diagnosis of borderline intellectual function, accepted the results of her IQ testing, and accepted her opinion that Plaintiff can read "at approximately a first grade level." (T. 46, 47, 49, 50, 55). The ALJ found, however, that such mental impairments did not erode Plaintiff's ability to perform "the basic mental demands of work," consisting of "the abilities to understand, carry out, and remember simple instructions and directions, respond appropriately to supervision, co-workers and usual work situations, and deal with changes in a routine work setting." (T. 56). The ALJ noted, in that regard, that Plaintiff's "cognitive limitations," while "long-standing," had not prevented him from working in the past. (T. 49).

The ALJ further stated that he did not find Plaintiff's or Ms. Alesso's testimony entirely credible, because it was inconsistent with the medical evidence (including, for example, Dinolfo's opinion regarding Plaintiff's ability to read) and Plaintiff's daily activities.

At step four of the sequential evaluation, the ALJ found that with the aforementioned RFC, Plaintiff can still perform his past work as an assembler in box factory, both as he actually performed it and as it is generally performed in the national economy. (T. 55).

10

Alternatively, the ALJ proceeded to the fifth step of the sequential evaluation and found, using the grids as a framework, that Plaintiff can perform other work. Specifically, the ALJ referenced grid rules 202.10 and 202.17. (T. 56). Both of those rules pertain to claimants with a maximum sustained work capability limited to light work, whose education level is "limited or less - at least literate and able to communicate in English," and whose past work experience is "unskilled or none." Grid rule 202.10 pertains to claimants "closely approaching advanced age" (age 50-54), while grid rule 202.17 pertains to claimants who are "younger individuals" (age 18-49). In selecting grid rules 202.10 and 202.17 to use as a framework, the ALJ stated that,

> [t]he claimant was . . . forty-eight years old, which is defined as a younger individual, age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age. The claimant has a limited education and is able to communicate in English. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

(T. 55).

In further explaining his step-five finding and his use of the grids, the ALJ referenced SSR 85-15, and stated that Plaintiff's "occasional postural limitations" and his non-exertional impairments would "have little or no effect on the occupational base of unskilled light work." (T. 56). The ALJ indicated that it was therefore unnecessary to obtain testimony from a vocational expert ("VE"), since such evidence is only required "when a claimant's non-exertional limitations significantlyl diminish[ ] the ability to perform the full range of employment indicated by the [relevant grid rule]." (T. 56). The ALJ added that, "The non-exertional limitations present in this case are fully addressed by Social Security Rulings, so I conclude that a framework finding is appropriate without

11

[VE] testimony in this case." (T. 56).

Plaintiff appealed to the Appeals Council, and as part of that appeal he submitted additional medical evidence, including Exhibit 20F, which includes three pages of office notes, from Dr. Choudry and from orthopedic specialist Christopher Brown, M.D. ("Brown"). (T. 387-390).  Choudry's notes, dated February 13, 2014, reference the fact that Plaintiff claimed to have injured his shoulder after slipping and falling on ice.  Plaintiff reportedly told Choudry that he was "unable to lift the right arm above the shoulder [due to] the pain." (T. 387).  Choudry recommended that Plaintiff see his orthopedic doctor "for possible torn rotator cuff." (T. 387).  On February 19, 2014, Plaintiff went to see Dr. Brown, and reportedly stated that he had injured the shoulder after he slipped while moving objects with a cart:

> He tells me about a week ago he was using a 2-wheel cart when he was
> moving stuff.  He tells me he slipped with his right foot and the cart came
> down on his right shoulder.  He tells me he currently rates the pain 9/10.
> He tells me he has increased pain with movement.

(T. 389).  Brown performed an examination of the shoulder and noted various positive findings. (T. 389).  Additionally, Brown noted that an x-ray of the shoulder showed "superior migration of the humeral head, AC joint osteoarthritis and humeral head osteoarthritis." (T. 389).  Brown's assessment was "right shoulder rotator cuff tear." (T. 389).   The Appeals Council referenced Plaintiff's submission of additional evidence, but declined to review the ALJ's determination.

On June 28, 2016, Plaintiff commenced this action.  On March 13, 2017, Plaintiff filed the subject motion [#9] for judgment on the pleadings.

Primarily, Plaintiff contends that the ALJ erred by finding that he has a "limited

education," as described in 20 C.F.R. § 416.964. Plaintiff maintains that he is actually "illiterate," and that the ALJ erred by failing to find that he is illiterate. Plaintiff argues that since he is illiterate, he should have been found disabled under grid rule 202.09. *See*, Pl. Memo of Law [#9-1] at p. 14 ("The Commissioner's medical vocational guidelines ('Grid Rule') 202.09 indicates that a claimant who is limited to light work, closely approaching advanced age, illiterate with unskilled work experience will be entitled to a finding of disability.").

Further, Plaintiff asserts that he has "borderline intellectual functioning," and that the ALJ therefore erred by relying upon the grids as a framework at step five of the sequential analysis, rather than taking testimony from a VE. On this point, Plaintiff cites *DeLeon v. Secretary*, 734 F.2d 930 (2d Cir. 1984) and *Genier v. Astrue*, 298 F.App'x 105, 107 (2d Cir. 2008).

Additionally, Plaintiff maintains that the ALJ erred in his treatment of the medical evidence. For example, Plaintiff contends that it was improper for the ALJ to grant significant weight to most of the opinions expressed by Dr. Choudhury, but reject Choudhury's opinion that Plaintiff would miss more than four days of work per month. Plaintiff also maintains that the ALJ "completely failed to consider the regulatory factors" when evaluating the medical evidence. Further, Plaintiff asserts that the ALJ failed to indicate what weight he gave to Dr. Dinolfo's opinion. Plaintiff also contends that the Appeals Council should have remanded the matter to the ALJ, based upon his submission of evidence concerning his shoulder injury.[3]

---

[3]Plaintiff also asserted, as part of his motion, that the ALJ erred when evaluating the medical evidence, because he "fail[ed] to acknowledge the existence of" an MRI test performed on December 19, 2013. However, this argument is incorrect, since the ALJ referred to this MRI testing in his decision. (T.

Moreover, Plaintiff maintains that the ALJ erred by failing to properly assess his credibility. For example, Plaintiff indicates that the ALJ relied too much on his activities of daily living, which "do not demonstrate the ability to perform full-time work." Plaintiff also maintains that the ALJ failed to explain what effect Ms. Alesso's statement had on his determination. Additionally, Plaintiff asserts that the ALJ failed to properly evaluate his work history in connection with the credibility determination. Finally, Plaintiff indicates that the ALJ improperly cited his alleged inconsistent pursuit of medical treatment as a basis to make a negative credibility finding, without exploring the reasons for such inconsistency.[4]

Plaintiff also argues that the ALJ's determination that he can perform his past relevant work as a laborer in a box assembly factory is erroneous, because the ALJ used the "light" work classification "assembler," DOT No. 706.687-010, when he should have used the "medium" work classification "box maker," DOT 794.684-014. Plaintiff indicates that the ALJ's error resulted from the fact that he attempted to make the DOT classification himself, rather than seeking assistance from a VE. In any event, Plaintiff maintains that his past work at the box factory actually involved medium work, which he cannot now perform according to the ALJ's RFC finding, and that the ALJ therefore erred by finding that he can perform his past relevant work as it was actually performed by Plaintiff.

---

46) (Citing to "Exhibit 14F, pages 15-16," which is the MRI report). During oral argument, Defendant's counsel acknowledged that fact, but nevertheless argued that the ALJ failed to discuss the results of the test, which showed encroachment on the nerves of the lumbar spine.

[4]Plaintiff also maintains that the ALJ "failed to consider" medical evidence that would support Plaintiff's credibility, such as the aforementioned MRI performed on December 14, 2013. However, as already noted, the ALJ considered that MRI.

On March 20, 2017, Defendant filed the subject cross-motion [#10] that disputes all of Plaintiff's arguments. On April 13, 2017, Plaintiff filed a reply. On September 7, 2017, counsel for the parties appeared before the undersigned for oral argument, with Ms. Lechleitner appearing by telephone with the Court's permission.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

DISCUSSION

The ALJ's Determination Regarding Plaintiff's Literacy

Plaintiff maintains that the ALJ erred by failing to make a determination as to whether he is illiterate. Plaintiff does not contend that the evidence in that regard was so overwhelming that the ALJ was *required* to find that he was illiterate, but insists that the ALJ failed to make a finding one way or another as to literacy, even though there was "a significant amount of evidence in the record to support a finding that [he] is illiterate."[5] Plaintiff asserts that the ALJ "failed to address" evidence of Plaintiff's illiteracy, such as Ms. Allesso's affidavit stating that Plaintiff cannot read or write. *See,*

_____

[5]Pl. Memo of Law [#9] at p. 14.

15

Pl. Memo of Law [#9] at pp. 16-17 ("[T]he ALJ does not state whether he credits [Plaintiff's] testimony or Ms. Allesso's statement that claimant cannot read or write a complete job application."). Alternatively, Plaintiff argues that if he can read only at the first-grade or third-grade level that he should be deemed "functionally illiterate." Plaintiff requests that the matter be "remanded for the ALJ to make specific findings with respect to [his] illiteracy."[6]

Plaintiff's argument on this point raises two issues: Whether the ALJ made any finding as to Plaintiff's literacy; and, if the ALJ found that Plaintiff is literate, whether such determination was correct in light of the relevant regulation, 20 C.F.R. § 416.964(b)(1).

As to the first issue, the Court disagrees with Plaintiff since it is evident from the ALJ's Decision that he rejected the claim of illiteracy, and found that Plaintiff is literate. For example, the ALJ expressly noted that "although [Ms. Alesso] indicated that the claimant cannot read or write," "Dr. Dinolfo pointed out that the claimant's reading abilities were at approximately a first grade level." (T. 49). Further, the ALJ noted that Plaintiff had completed the 8th grade, that he is able to fill out his name and address on job applications, and that he had unsuccessfully attempted to pass the GED test three times. (T. 51, 64).[7] Further, the ALJ noted that Plaintiff claimed to have "reading problems" (T.51), as opposed to illiteracy, and in that regard Plaintiff testified that he

---

[6]Pl. Memo of Law [#9] at p. 17.

[7]Such fact supports the ALJ's determination. Although plaintiff failed the exam, it takes a certain level of confidence in one's reading and writing abilities to even attempt the GED exam, which belies Plaintiff claim of illiteracy. In other words, a truly illiterate person would not attempt the GED test in the first place, let alone three times.

had "problems with long words." (T. 17). Finally, the ALJ expressly found that Plaintiff

"has a limited education" (T.55), which is two steps above "illiteracy" as those terms are

used in 20 C.F.R. § 416.964.[8]  To find that a claimant has a "limited education" is, by

definition, to find that he is not illiterate.  For all of the foregoing reasons, the Court finds

that the ALJ addressed and rejected Plaintiff's claim of illiteracy, contrary to what

Plaintiff argues.

The next issue is whether the ALJ was correct to find that Plaintiff is literate,

where the evidence of record indicates that Plaintiff completed the 8th grade, but can

presently read at between the first-grade and third-grade level.  Plaintiff contends that

he is "functionally illiterate."  The Commissioner's regulations define "illiteracy" as

follows:

> Illiteracy means the inability to read or write.  We consider someone
> illiterate if the person cannot read or write a simple message such as
> instructions or inventory lists even though the person can sign his or her
> name.  Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 416.964(b)(1).  A "limited education," however, is defined as follows:

> Limited education means ability in reasoning, arithmetic, and language
> skills, but not enough to allow a person with these educational
> qualifications to do most of the more complex job duties needed in semi-
> skilled or skilled jobs.  We generally consider that a 7th grade through the
> 11th grade level of formal education is a limited education.

20 C.F.R. § 416.964(b)(3).

Between "illiteracy" and "limited education" is a another category, "marginal

education," which is defined as follows:

---

[8]The steps are "illiteracy," "marginal education," "limited education" and "high school education
and above."

17

> Marginal education means ability in reasoning, arithmetic, and language skills *which are needed to do simple, unskilled types of jobs*. We generally consider that formal schooling at a *6th grade level or less* is a marginal education.

20 C.F.R. § 416.964(b)(2) (emphasis added). Accordingly, a "marginal education" encompasses essentially any amount of formal schooling, provided that the claimant obtains at least the "ability in reasoning, arithmetic, and language skills which are needed to do simple unskilled types of jobs."[9] Grid rules 202.10 and 202.17 both direct a finding of "not disabled" for claimants whose education is "*limited or less* -- at least literate and able to communicate in English," and who otherwise meet the requirements for those rules. (emphasis added). In other words, such a claimant could have *either* a "limited education" or a "marginal education," provided that such claimant was at least literate and able to communicate in English.

Here, the record indicates that Plaintiff had "formal education" through the 8th grade.[10] Accordingly, Plaintiff's education falls squarely within the designation of "limited education," and does not fit within the definition of "illiteracy." Plaintiff nevertheless asserts that he is "functionally illiterate," despite his years of schooling.

---

[9]Even assuming *arguendo* that Plaintiff failed to qualify as having a "limited education" despite his actual years of formal schooling, he clearly seems to have at least a "marginal education" (*i.e.* "limited or less"), since he has at least a low level of literacy, had many years of formal schooling and has performed a variety of "simple unskilled types of jobs" throughout his adult life, including being co-owner of a small business for three years. (T. 32) ("I started my business in '03. My business crashed in '06."). The ALJ repeatedly emphasized that Plaintiff's non-exertional impairments had not prevented him from working at a variety of such jobs. (T. 49) ("Despite the claimant's reports of a long-time cognitive impairment, the record shows that the claimant worked at substantial gainful activity levels in 1999 despite [such] limitations."); (T. 50) ("The evidence in the record reveals that the claimant does not currently have any deficits in adaptive functioniong[.]"); (T. 56) ("[C]laimant has no significant limitations in the peformance of these basic mental demands of work.").

[10]Although Plaintiff now claims that he received unspecified "special education intervention during his youth" (T. 326), he previously indicated that he did not "attend special education classes." (T. 111).

Such argument potentially has merit, since the fact that a claimant completed a particular grade in school is not dispositive of the claimant's educational level. In particular, the regulation states that,

> the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, *if there is no other evidence to contradict it*, we will use your numerical grade level to determine your educational abilities.

20 C.F.R. § 416.964(b) (emphasis added). However, while there is clearly evidence that Plaintiff's reading and writing abilities are far below the eighth-grade level, there is also substantial evidence that he is at least literate.

The Court therefore disagrees with Plaintiff's contention that the ALJ should have considered him illiterate when applying the grids at step five of the sequential evaluation. The Commissioner's determination on that point (to categorize Plaintiff has having a "limited education") is affirmed.

The Court also affirms the ALJ's use of the grids at step five of the sequential evaluation, since Plaintiff has not shown either that such decision was legally erroneous or that it was unsupported by substantial evidence. In that regard, Plaintiff argues that the ALJ was required to obtain testimony from a VE rather than using the grids, since Plaintiff's reading difficulties and borderline intellectual functioning "will *necessarily* effect [his] ability to function in any type of employment." Pl. Memo of Law [#9] at p. 25 (emphasis added). Plaintiff, though, does not cite any specific limitation flowing from those conditions that would prevent him from performing unskilled light work. Nor has Plaintiff shown that the ALJ's finding, that Plaintiff's non-exertional impairments do not significantly limit his ability to perform a full range of light unskilled work, is unsupported

by substantial evidence.

The Second Circuit has noted that, "[s]urely a borderline IQ has *a bearing* on employability, even as a mop-pusher, porter, or maintenance man." *DeLeon v. Sec. of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).  (emphasis added).  At least one court decision from this Circuit has interpreted that statement as establishing a *per se* rule prohibiting ALJs from using the grids whenever the claimant has borderline intellectual functioning diagnosis. *See, e.g., Searles v. Astrue*, No. 09-CV-6117, 2010 WL 2998676, at *5 (W.D.N.Y. July 27, 2010) ("Application of the Grid Rules is inappropriate when a claimant has borderline intellectual functioning."). This is the position taken by Plaintiff here.

However, the weight of authority on this point within the Second Circuit is that when deciding whether use of the grids is appropriate, the essential factor is whether the claimant's borderline intelligence actually interferes with the ability to work. *See, e.g., Gallup v. Comm'r of Soc. Sec.*, No. 6:11-CV-1345 NAM, 2014 WL 2480175, at *12 (N.D.N.Y. June 3, 2014) ("Here, the ALJ determined that the additional limitations [("psychiatric impairments, borderline intellectual functioning and limitations in reading and writing")] have no significant effect on the occupational base of unskilled medium work". Thus, the ALJ did not err in relying on the Grids to determine that jobs existed in the economy that plaintiff could perform."); *see also, Velez v. Astrue*, No. 1:11-CV-1487 MAD, 2013 WL 474281, at *11 (N.D.N.Y. Feb. 7, 2013) ("The Second Circuit has held that the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance on the grids.  The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and

perform is required only when a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines. . . . [E]xclusive reliance on the Grids will be deemed inappropriate only where the non-exertional impairments significantly limit the range of work permitted by his exertional limitations.") (citations and internal quotation marks omitted); *cf., Gallivan v. Apfel*, 88 F. Supp. 2d 92, 99 (W.D.N.Y. 2000) ("[D]espite the ample evidence of plaintiff's environmental limitations as well as the evidence of plaintiff's borderline intellectual functioning, the ALJ concluded that plaintiff's nonexertional limitations did not significantly affect her employment opportunities. He then concluded that plaintiff was not disabled "within the framework" of the grids. . . . However, where, as here, a claimant's nonexertional impairments *significantly limit the range of work* permitted by her exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.") (emphasis added).

The Court agrees with the weight of such authority and disagrees with Plaintiff's contention that an ALJ is prohibited from using the grids, and must always consult a VE, whenever a claimant is diagnosed with borderline intelligence. There is no such *per se* rule. In sum, the Court agrees with Defendant that a diagnosis of borderline intelligence does not *necessarily* exclude the use of the medical vocational grids at step five of the sequential evaluation. Moreover, the ALJ's ruling on this point is supported by substantial evidence that Plaintiff is able to perform a full range of unskilled work despite his non-exertional impairments.

21

For all of the foregoing reasons, Plaintiff's argument on this point lacks merit and is denied.

New Evidence Submitted to the Appeals Council

Plaintiff next contends that the Appeals Council erred by failing to review the ALJ's determination, since the additional evidence submitted to the Appeal Council (Exhibits 20F & 21F) would have affected the ALJ's findings at step two of the sequential evaluation. Plaintiff maintains that the additional evidence "could have influenced the ALJ to consider the right shoulder impairment to be severe." Pl. Memo of Law [#9] at p. 22. The Court agrees.

"Under the Commissioner's regulations, the Appeals Council will consider new and material evidence only if it relates to the relevant period on or before the date of the ALJ's decision. Evidence is material if it is relevant to the claimant's condition during the time period for which benefits were denied, and there is a reasonable possibility that the new evidence would have influenced the ALJ to decide the claimant's application differently." *Suttles v. Colvin*, 15-3803, 654 F. App'x 44, 47 (2d Cir. Jun. 30, 2016) (citations omitted).

Here, Exhibits 20F and 21F were new and material. The additional evidence might have caused the ALJ to decide Plaintiff's claim differently, since it tends to support Plaintiff's claim that he sustained a shoulder injury that affected his ability to lift. In particular, Plaintiff testified that following his fall and shoulder injury, he could barely lift ten pounds. For the reasons noted earlier, the ALJ understandably overlooked this testimony when drafting his decision. However, if the ALJ were to find that the shoulder injury was a severe impairment, it could change the current RFC determination, which

22

indicates that Plaintiff "is able to lift and/or carry twenty pounds occasionally and ten pounds frequently." Although the ALJ's finding in that regard was solidly based upon Dr. Choudry's report, such report was expressly addressed only to limitations imposed by Plaintiff's low back pain, and was apparently based on Choudry's office notes from November 2013, which was prior to Plaintiff's shoulder injury.

Defendant nevertheless insists that the Appeals Council did not err in deciding not to review the ALJ's ruling. Alternatively, Defendant seems to argue that any error in that regard was harmless, since the shoulder injury did not limit Plaintiff's ability to work in any event. On these points, Defendant maintains that Plaintiff was not prescribed additional medication for the shoulder injury, at least as far as the additional notes indicate. Additionally, Defendant points to Plaintiff's testimony at the hearing that he was taking only Tylenol for pain, and that he was still doing his daily chores. *See*, Def. Memo of Law [#10] at pp. 20-21. Such evidence, though, is not necessarily incompatible with Plaintiff's testimony that he could barely lift ten pounds following his shoulder injury. Moreover, there is presently no medical opinion evidence in the record concerning the effect, if any, of the shoulder injury on Plaintiff's ability to work.

Accordingly, the Court finds that remand is necessary to allow the Commissioner to consider the additional evidence as part of the sequential evaluation. Since such evidence could well change the ALJ's sequential evaluation from step 2 onward, the Court declines to consider the additional points raised by Plaintiff's motion at this time.[11]

_____

[11]Although the Court has affirmed the ALJ's use of the grids on the present record, the Court notes that upon remand it would not necessarily be appropriate for the ALJ to again apply the grids at step five. For example, the ALJ might find that Plaintiff's shoulder injury prevents him from performing the exertional demands of light work.

However, during oral argument Defendant admitted that the ALJ erred at step four of the sequential evaluation, insofar as he found that Plaintiff could perform his past relevant work in the box factory as it was actually performed by him. Therefore, it is now undisputed that Plaintiff cannot perform his past relevant work in the box factory as he actually performed it, since that was medium work, not light work.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings (Docket No. [#9]) is granted and Defendant's cross-motion [#10] is denied. This matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
    August 6, 2018

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge